IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 3:20-mj-00374-DMS |
| vs. ) | |
| ) | |
| SANH SUNNI THAMPITHAK, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Clinton J. Wight, being duly sworn, hereby depose and say:

## INTRODUCTION AND AFFIANT BACKGROUND

1.     I am a Special Agent with the Internal Revenue Service Criminal Investigation ("IRS-CI") and have been so employed since September 2008.  I am currently assigned to the Anchorage, Alaska, post of duty.  My responsibilities include investigating potential criminal violations of the Internal Revenue Code ("IRC"), Title 26, United States Code ("U.S.C."); violations of the Money and Finance statutes ("Title 31, U.S.C."); and violations of select provision of the general criminal code ("Title 18, U.S.C.").

2.     During my more than 11 years as an IRS-CI Special Agent, I have conducted investigations involving violations of Titles 18, 26 and 31 U.S.C. and assisted in numerous other investigations of violations of these same titles.  I have interviewed witnesses, conducted subject interviews, executed search warrants, analyzed financial records, and used other investigative techniques to secure relevant information  regarding various federal crimes.



3.      I submit this affidavit in support of a Criminal Complaint charging that SANH

SUNNI THAMPITHAK a/k/a ALLYSIA THAMPITHAK a/k/a ALLY THAMPITHAK

("THAMPITHAK") did willfully aid and assist in, and procure, counsel, and advise the

preparation and presentation to the Internal Revenue Service ("IRS"), of U.S. Individual Income

Tax Returns, Forms 1040, ("Form 1040") either individual or joint, for the taxpayers and

calendar years hereinafter specified. The returns were false and fraudulent as to material matters,

in that they represented that the taxpayers were entitled under the provisions of the Internal

Revenue laws to claim deductions or credits for items hereinafter specified, whereas, as

THAMPITHAK then and there knew, the taxpayer was not entitled to claim the specified

deductions or credits in the claimed amounts, with each claim alleged as a separate violation of

Title 26 U.S.C. § 7206(2), Fraud and False Statements:

| FILING OF or ON OR ABOUT | TAXPAYER | CALENDAR TAX YEAR | FALSELY CLAIMED ITEM | APPROXIMATE AMOUNT FALSELY CLAIMED |
|---|---|---|---|---|
| January 29, 2018 | P.L. | 2017 | Line 53, Residential Energy Credits | $4,954 |
| February 2, 2017 | P.L. | 2016 | Line 29, Total Itemized Deductions | $30,227 |
| February 20, 2018 | R.V. and E.V. | 2017 | Line 53, Residential Energy Credits | $4,500 |
| February 15, 2017 | R.V. and E.V. | 2016 | Line 29, Total Itemized Deductions | $14,090 |
| April 2, 2016 | R.B. and T.B. | 2015 | Line 29, Total Itemized Deductions | $36,794 |
| February 10, 2016 | M.H. | 2015 | Line 29, Total Itemized Deductions | $24,482 |
| May 23, 2016 | B.K. | 2015 | Line 29, Total Itemized Deductions | $23,907 |
| March 31, 2017 | S.V. | 2016 | Line 29, Total Itemized Deductions | $30,744 |
| January 31, 2016 | C.D. | 2015 | Line 29, Total Itemized Deductions | $16,175 |
| February 1, 2016 | B.D. | 2015 | Line 29, Total Itemized Deductions | $22,498 |
| February 4, 2017 | R.T. | 2016 | Line 29, Total Itemized Deductions | $14,526 |
| January 30, 2017 | R.S. | 2016 | Line 29, Total Itemized Deductions | $20,248 |
| February 25, 2018 | V.L. | 2017 | Line 53, Residential Energy Credits | $4,000 |

4.     The information put forth in this affidavit is based upon my training and experience, my personal knowledge of this investigation, information conveyed to me by other law enforcement agents, and other sources of information described herein. This affidavit is submitted for the limited purpose of establishing probable cause to believe THAMPITHAK has committed the offenses described above and does not set forth all my knowledge about this matter.



Case 3:20-mj-00374-DMS   Document 1-1   Filed 07/14/20   Page 3 of 27

## RELEVANT STATUTE

5.      Fraud and False Statements, in violation of 26 U.S.C. § 7206(2), is violated when a person willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the Internal Revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to a material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document.

## TECHNICAL TERMS AND OVERVIEW OF ONLINE TAX FILING

6.      Based on my training and experience conversations with other law enforcement agents, and participation in other investigations, I use the following terms to convey the following meanings:

   a.      Form 1040 is the standard form or return taxpayers use to report income, adjustments to income, exemptions, deductions, taxes, credits, claim refunds for overpayment of tax, and other pertinent tax information to the IRS.

   b.      Itemized Deduction: taxpayers may elect to take a standard deduction, or they may itemize deductions for specific expenses paid to reduce their taxable income. Amongst the itemized expenses that may be deducted are unreimbursed employee expenses, amounts paid for certain taxes, interest, charitable contributions, and other miscellaneous expenses.

   c.      Schedule A, Itemized Deductions, ("Schedule A"): Schedule A is the form taxpayers electing to itemize deductions use to figure the total amount of itemized deduction for the various deductible expenses. Schedule A is attached and filed with the



Form 1040. The total itemized deductions are generally reported on Schedule A Line 29 with the amount carried forward to the Form 1040.

d.      Employee Business Expenses ("EBE"): EBE are a miscellaneous itemized deduction for ordinary and necessary expenses for a job. The EBE deduction was available to taxpayers until 2018 and was among miscellaneous deductions subject to a two percent of adjusted gross income limitation. An ordinary expense for a job was one that was common and accepted in the taxpayer's field or trade, business, or profession. A necessary expense was one that was helpful and appropriate for the taxpayer's business. EBE amounts were generally reported on Form 2106, Employee Business Expenses, ("Form 2106") and carried forward to the Schedule A to be included in the total itemized deductions reported on Line 29. Amongst the ordinary and necessary EBE was unreimbursed use of a taxpayer's personal car for business purposes. Taxpayers could choose to use a standard mileage rate based on miles driven to compute the amount of deductible car expenses (i.e. multiplying the standard mileage rate by the number of miles driven for business purposes). Taxpayers could not deduct the miles driven for commuting from their home to their main or regular place of work (these costs were nondeductible personal commuting expense).

e.      Residential Energy Credits ("REC"): REC refers to two refundable tax credits generally available to individuals under 26 U.S.C. §§ 25C and 25D for energy saving improvements made to their primary residence. The taxpayer uses Form 5695, Residential Energy Credits, ("Form 5695") to figure and take the residential energy credits. The credit is then carried forward to the Form 1040 and generally reported on Line 53. Refundable tax credits are treated as payment of tax. If the total amount of



refundable credits, withheld federal income tax, and estimated tax payments is more than a taxpayer's total tax, the excess is refunded to the taxpayer.

      f.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      g.      IP Address: The Internet Protocol address ("IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in a range 0-255, separated by periods (e.g. 121.56.97.178). Every computer attached to the Internet must be assigned and IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static – that is, long-term – IP addresses, while other computers have dynamic – that is frequently changed – IP addresses.

      h.      IRS e-file is the automated electronic filing system created by the IRS that allows submission of tax return data in the form of electronic records. It includes both electronically preparing and filing the returns.

      i.      Authorized IRS e-file Provider ("Provider"): A Provider is a business or organization authorized by the IRS to participate in IRS e-file.

      j.      Modernized e-file Program ("MeF"): The MeF is a web-based electronic filing system designed and developed by the IRS that allows electronic filing of various IRS tax forms and returns through the Internet. Beginning in February 2010, this included Forms 1040.



k.     A taxpayer opting to use MeF to file his or her Form 1040 must use IRS approved tax preparation software to prepare the return. Once prepared and signed, the tax preparation software "originates" the electronic submission of the return. During this process the electronic return data is converted into a format defined by the IRS for internal production standards. Returns that successfully pass the validation process are considered "accepted" and forwarded for additional processing to the IRS systems used to process paper returns.

l.     Amongst Providers is TaxHawk, Inc., which owns and operates online tax preparation websites to include FreeTaxUSA.com.

m.     Tax Preparer ("Preparer"): A Preparer is anyone who prepares, assist in the preparation of, all or substantially all of any U.S. federal tax return, claim for refund, or other tax form submitted to the IRS. Anyone who is compensated for these activities must obtain an individual preparer tax identification number ("PTIN") from the IRS. A PTIN must be renewed each year with verification of the preparer's personal information, business information, and explanations regarding any felony convictions and or problems with the preparer's own U.S. individual or business tax obligations. Preparers that operate without a PTIN may be subject to the penalty provisions of 26 U.S.C. § 6695, Other Assessable Penalties with respect to the Preparation of Tax Returns for Other Persons. Amongst the penalties is a $50 penalty for each return or claim that failed to include the PTIN (up to $25,000 each year).

n.     Return Preparer Program ("RPP"): RPP is an IRS program to identify abusive tax preparers who prepare false income tax returns, frequently for large numbers of taxpayers. RPP fraud schemes includes preparing false Forms 1040 and or related



schedules that claim inflated personal or business expenses, false deductions, unallowable credits, and or excessive exemptions, which materially affects the determination of the client's tax liability. The fraud occurs when the false form is submitted to the IRS. In some situations, the client, or taxpayer, may not even know of the false expenses, deductions, exemptions and or credits shown on his or her tax return. However, when the IRS detects a fraudulent return, the taxpayer – not the return preparer – is responsible for paying any corrected tax and potential penalties.

## FACTS IN SUPPORT OF PROBABLE CAUSE

### Overview of Investigation

7.     Beginning in May 2017, the Internal Revenue Service ("IRS") Scheme Development Center ("SDC") referred more than 360 questionable Forms 1040 for tax years 2015 and 2017 to IRS-CI. The returns allegedly claimed more than $1.38 million in income tax refunds.

8.     Analysis of the 360 Forms 1040 the SDC identified as questionable revealed they were purportedly self-prepared by the respective taxpayers and were electronically filed using the Internet. Of these, about 269 claimed itemized deductions on Schedule A and received refunds for overpayment of tax. The itemized deductions claimed on the returns ranged from 13 percent to 749 percent of adjusted gross income. Of these, at least 180 claimed deductions that were at least 50 percent of adjusted gross income.

9.     IRS records showed the foregoing 269 returns were received by the IRS from three different Internet Protocol (IP) addresses: 24.237.213.104, 66.223.220.90, and 72.42.185.79, respectively. According to the American Registry for Internet Numbers ("ARIN"), the three IP addresses were registered to an Internet Service Provider ("ISP") in



Anchorage, Alaska. Of these 269 returns, 18 were filed referencing email address sanh66@hotmail.com.

10.    According to records accessible from the State of Alaska, Department of Commerce, Community, and Economic Development, website an email was sent on or about June 9, 2014, from "allysia Sanh Thampithak <sanh66@hotmail.com>" to change a corporate address.

11.    A criminal investigation was subsequently initiated on THAMPITHAK for potential violations of 26 U.S.C. § 7206(2).

<u>Witness Interviews Showed Thampithak Prepared Materially False Returns</u>

12.    On or about April 3, 2018, a search warrant was executed on THAMPITHAK's residence. Seized during the search warrant was a binder containing the names of clients for whom THAMPITHAK prepared tax returns. Each of the following witnesses except for R.T. were listed as clients.

*Witness P.L*

13.    On or about January 3, 2019, P.L. was interviewed and provided the following information regarding his 2016 and 2017 Forms 1040:

        a.    P.L. said he did not recall the name of the person who prepared his 2016 and 2017 Forms 1040, but he referred to her by the Lao word for "short". He paid her about $100 for the 2016 return and about $150 for the 2017 return.

        b.    P.L did not give the preparer the approximately $4,954 claimed as a 2016 residential energy credits carry forward on the 2017 Form 5695. P.L. said he had no clue where the preparer got the number. P.L and the preparer talked in general terms about



how much on average he spent for electricity and how his gas bill spiked from an incorrectly installed furnace.

      c.      P.L did not provide or pay the approximately $2,300 claimed as a general sales taxes expense paid deduction on his 2016 Schedule A. P.L. did not talk about it with the preparer.

      d.      P.L. did not provide or pay the approximately $11,400 claimed as a personal property taxes expense paid deduction on his 2016 Schedule A. P.L. discuss personal property taxes with the preparer. P.L. told investigators he paid $200 to the city.

      e.      P.L. did not provide the preparer the miles used to compute the approximately $8,100 claimed as an EBE paid deduction on his 2016 From 2106. The preparer did not discuss miles driven. The preparer asked him if he used his vehicle for work and how much he spent on gas. He told her he used his vehicle for work. The preparer did not ask P.L how he used his vehicle for work. When investigators asked P.L how he used his vehicle for work, P.L. said he used gas to get to and from work and nowhere else (i.e. commuting).

      f.      P.L. provided the preparer the approximately $3,500 travel expenses claimed as an EBE paid deduction on his 2016 Form 2106. However, he told the preparer the $3,500 was for three people to fly to Laos. P.L. went to Laos because his father had passed away. P.L. said he did not know the travel expenses were being claimed as an unreimbursed work expense. The preparer did not explain this to him.

      g.      P.L. did not specifically provide the approximately $960 gas expense claimed as miscellaneous expenses paid deduction on his 2016 Schedule A. Rather, P.L.



provided an average biweekly amount he spent on gas. P.L. said he used gas only to go to and from work (i.e. commute).

14.     P.L. did not provide the preparer the approximately $4,800 international property expense claimed as miscellaneous expenses paid on his 2016 Schedule A. P.L. did not talk with the preparer about the amount claimed. P.L. did not own any international property.

15.     Based on my training, experience, conversations with other law enforcement officers, participation in other investigations, and the foregoing, I know:

     a.      THAMPITHAK prepared P.L.'s 2016 and 2017 Forms 1040 in exchange for money. The returns were materially false.

     b.      P.L. was not entitled to the residential energy credits claimed on his 2017 Form 5695 that carried forward to the 2017 Form 1040 Line 53. This false credit resulted in P.L. receiving a refund for overpayment of tax approximately 1094 percent more than the amount due him.

     c.      P.L. was not entitled to claim the foregoing deductions that totaled approximately $30,227 (after adjusted gross income limitations), which were included in his 2016 Schedule A Line 29. The false deductions resulted in P.L. receiving a refund for overpayment of tax approximately 1,575 percent more than the amount due him.

*Witness R.V. and E.V.*

16.     On or about December 18, 2018, R.V. and his spouse, E.V., were interviewed and provided the following pertinent information regarding their 2016 and 2017 Forms 1040.

     a.      R.V. said he did not know the last name of the person that prepared their 2016 and 2017 Forms 1040, but the preparer's first name was ALLY. They paid her about $200 for each return.



b.     Neither R.V. nor E.V. gave ALLY the approximately $4,500 claimed as a 2016 residential energy credit carryforward on their 2017 Form 5695. R.V. shared he did not know from where the amount came. They did not talk home improvements, electricity, gas, or heating. ALLY asked about appliance purchases. R.V. shared they bought a used washing machine, replaced their water heater, and bought a new dryer. R.V. did not recall what year the water heater was replaced. They bought the dryer sometime before 2017.

c.     R.V. did not provide ALLY the approximately $2,600 claimed as a personal property taxes paid deduction on their 2016 Schedule A. He did not talk about personal property taxes with ALLY.

d.     R.V. did not provide ALLY the miles used to compute the approximately $6,480 claimed as an EBE deduction on a 2016 Form 2106 for E.V. use of their car. They talked with ALLY about using the car for work and driving to and from work. R.V. told investigators he drove E.V. to and from work; they did not use the car for her employer.

e.     R.V. did not know from where the approximately $4,543 claimed as an EBE deduction on a 2016 Form 2106 came. He talked with ALLY about uniforms to include a requirement for non-slip shoes and snow boots at his job.

f.     R.V. did not specifically discuss with ALLY the approximately $400 registration fee and $1,200 gas ($1,600 total) claimed as other miscellaneous expenses paid deduction on Schedule A. They talked about gas expenses for the car, but they did not talk numbers.



17.     Based on my training, experience, conversations with other law enforcement officers, participation in other investigations, and the foregoing, I know:

    a.     THAMPITHAK prepared R.V. and E.V.'s 2016 and 2017 Forms 1040 in exchange for money. These returns were materially false.

    b.     R.V. and E.V. were not entitled to the residential energy credits claimed on their 2017 Form 5695 that carried forward to the 2017 Form 1040 Line 53. The false credit resulted in their receipt of a refund for overpayment of tax approximately 722 percent more than the amount due them.

    c.     R.V. and E.V. were not entitled to claim deductions that totaled approximately $14,090 (inclusive of about $500 in R.V. business meals not discussed with THAMPITHAK and after adjusted gross income limitations), which were included in their 2016 Schedule A Line 29. The false deductions resulted in R.V. and E.V. receiving a refund for overpayment of tax approximately 249 percent more than the amount due them.

*Witness R.B. and T.B.*

18.     On or about December 14, 2018, R.B. and T.B. were interviewed and shared the following pertinent information regarding their 2015 Form 1040:

    a.     THAMPITHAK prepared the return for about $150.

    b.     Neither R.B. nor T.B. provided THAMPITHAK the approximately $14,561 claimed as a state and local income taxes paid deduction on Schedule A. Further, R.B. said he had not paid state and local income taxes. R.B. said he thought THAMPITHAK asked about other expenses, but she did not ask questions about income taxes.



c.     R.B. did not provide THAMPITHAK the miles used to compute the approximately $24,150 claimed as an EBE paid deduction on Form 2106. R.B. said he clearly told THAMPITHAK that he only used his car to commute and not for work. T.B. added that she told THAMPITHAK her employer reimbursed her for driving her vehicle between job locations.

19.     Based on my training, experience, conversations with other law enforcement officers, participation in other investigations, and the foregoing, I know:

a.     THAMPITHAK prepared R.B. and T.B.'s 2015 Form 1040 in exchange for money. The return was materially false.

b.     R.B. and T.B. were not entitled claim deductions that totaled approximately $36,794 (after adjusted gross income limitations), which were included in their 2015 Schedule A Line 29. The false deductions resulted in R.V. and E.V. receiving a refund for overpayment of tax approximately 316 percent more than the amount due them.

*Witness M.H.*

20.     On or about December 15, 2018, M.H. was interviewed and shared the following pertinent information regarding her 2015 Form 1040:

a.     M.H. said she did not remember the preparer's last name, but the preparer's first name was ALLY or ALLYSIA. M.H. paid the preparer about $150.

b.     M.H. did not provide ALLY the mileage used to compute the approximately $14,375 claimed as an EBE paid deduction on Form 2106. M.H. did not drive the 25,000 miles used to compute the expense.



c.    M.H. did not provide ALLY the approximately $2,300 claimed as a general sales taxes paid deduction on Schedule A. M.H. said she had no idea from where the amount came.

d.    M.H. did not provide ALLY the approximately $6,600 claimed as a personal property taxes paid deduction. M.H. did not buy personal property that had taxes. M.H. said she had not idea from where it came.

e.    When asked about the approximately $2,000 other property expense claimed as miscellaneous expenses paid deduction on Schedule A, M.H said she owned no other property than her car. M.H. recalled telling ALLY about the home her mother owned in the Philippines. M.H. told ALLY it was in her mother's name.

21.    Based on my training, experience, conversations with other law enforcement officers, participation in other investigations, and the foregoing, I know:

a.    THAMPITHAK prepared M.H.'s 2015 Form 1040 in exchange for money. The return was materially false.

b.    M.H. was not entitled to claim deductions that totaled approximately $24,482 (after adjusted gross income limitations), which were included in her 2015 Schedule A Line 29. The false deductions resulted in M.H. receiving a refund for overpayment of tax approximately 244 percent more than the amount due her.

*Witness B.K.*

22.    On or about December 17, 2018, B.K. was interviewed and provided the following pertinent information regarding his 2015 Form 1040:

a.    B.K. did not know the preparer's name. He said he knew her by her nickname Sun (phonetic), which was "Short" in English. He paid her about $200.



b.    B.K. did not provide the preparer the approximately $1,544 claimed as a general sales taxes paid deduction on Schedule A. He paid no sales taxes.

c.    B.K. did not provide the preparer the approximately $5,400 claimed as a personal property taxes paid deduction on Schedule A. He paid no personal property taxes.

d.    B.K. did not provide the preparer the approximately $4,025 in attorney fees expense claimed as miscellaneous expenses paid deduction on Schedule A. B.K. said he never had a lawyer, did not pay a lawyer, and did not talk about an attorney with the preparer.

e.    B.K. did not provide the miles driven used to compute the approximately $14,375 claimed as an EBE deduction on Form 2106. B.K.'s car sat at home, and he did not drive it. B.K. did not have a conversation about mileage with the preparer.

23.    Based on my training, experience, conversations with other law enforcement officers, and participation in other investigations, I know:

a.    THAMPITHAK prepared B.K.'s 2015 Form 1040 in exchange for money. The return was materially false.

b.    B.K. was not entitled to claim deductions that totaled approximately $23,907 (after adjusted gross income limitations), which were included in his 2015 Schedule A Line 29. The false deductions resulted in B.K. receiving a refund for overpayment of tax approximately 773 percent more than the amount due him.

*Witness S.V.*

24.    On or about December 10, 2018, S.V. was interviewed and provided the following pertinent information regarding his 2016 Form 1040:



a. The preparer's name was ALLY. S.V. said he did not know ALLY's last name. He paid ALLY about $250 or $300.

b. S.V. did not know where ALLY got the about $4,800 claimed as a personal property taxes paid deduction on Schedule A. He had not bought anything in the last 15 years other than vehicles.

c. S.V. did not give ALLY either the approximately $4,505 other business expenses or the miles used to compute the approximately $21,600 in vehicle expenses ($26,105 total) claimed as an EBE deduction on Form 2106. S.V. explained he operated a business for which he had a separate business return prepared by a different preparer. S.V. did not discuss with ALLY the business use of his personal car. S.V. said it was a "shock to [him]" that vehicle expenses were on his personal return.

d. S.V. did not provide ALLY the approximately $1,542 gas and registration expenses claimed as miscellaneous expenses deduction on Schedule A. S.V. only told ALLY how many cars he had. He did not discuss gas or registrations with her.

25. Based on my training, experience, conversations with other law enforcement officers, and participation in other investigations, I know:

a. THAMPITHAK prepared S.V.'s 2015 Form 1040 in exchange for money. The return was materially false.

b. S.V. was not entitled to claim deductions that totaled approximately $30,744 (after adjusted gross income limitations), which were included in his 2015 Schedule A Line 29. The false deductions resulted in S.V. receiving a refund for overpayment of tax approximately 205 percent more than the amount due him.

Case 3:20-mj-00374-DMS   Document 1-1   Filed 07/14/20   Page 17 of 27



*Witness C.D.*

26.     On or about December 10, 2018, C.D. was interviewed and provided the following pertinent information regarding his 2015 Form 1040:

        a.     C.D. initially said the preparer's name was Ashley, but he called her Short because her name in Lao was Sun (phonetic). When asked if the name ALLYSIA sounded familiar, C.D. said yes and spontaneously offered the preparer's name was ALLY or something like that. He paid her about $500 for separate returns for his spouse and himself (about $250 each).

        b.     C.D. did not give ALLY the approximately $2,900 claimed as a personal property taxes paid deduction on Schedule A. He did not talk about it with her. When asked if this could have been real estate taxes claimed on the wrong line, C.D. said he only talked with ALLY about his mortgage principle and monthly payments. He did not provide any information from the lender to ALLY. Following the interview, your affiant reconciled the amount claimed as a general sales taxes paid deduction on the Schedule A to Municipality of Anchorage property tax records (i.e. real estate taxes were entered as general sales taxes and not personal property taxes).

        c.     C.D. did not give ALLY the specific number of miles driven used to compute the approximately $13,275 claimed as an EBE deduction on Schedule A. C.D. said the amount looked like too much. C.D. said he drove a lot while taking care of clients of Good Samaritan, but he said he did not know how many and did not keep track.

27.     Based on my training, experience, conversations with other law enforcement officers, participation in other investigations, and the foregoing, I know:



Case 3:20-mj-00374-DMS   Document 1-1   Filed 07/14/20   Page 18 of 27

a.   THAMPITHAK prepared C.D.'s 2015 Form 1040 in exchange for money. The return was materially false.

b.   C.D. was not entitled to claim deductions that totaled approximately $16,175 (after adjusted gross income limitations), which were included in his 2015 Schedule A Line 29. The false deductions resulted in C.D. receiving a refund for overpayment of tax approximately 274 percent more than the amount due him.

*Witness B.D.*

28.   On or about December 7, 2018, B.D. was interviewed and provided the following pertinent information regarding his 2015 Form 1040:

a.   B.D. did not recall the preparer's name; however, he showed investigators a contact in his cellular telephone. The name listed was ALLY THAMPITHAK. He paid her about $150.

b.   B.D. did not give THAMPITHAK the approximately $9,540 used to compute the claimed $4,532 medical expenses deduction on Schedule A. He told THAMPITHAK he spent about $1,000 on allergy treatment. Your affiant notes that generally deductible medical expenses are reduced by 10 percent of adjusted gross income; consequently, B.D.'s $1,000 of medical expenses would not have been deductible expense because of his adjusted gross income.

c.   B.D. did not say anything to THAMPITHAK about the approximately $7,000 claimed as a general sales taxes paid deduction on Schedule A. B.D. said he had no idea where the number came from, and it was not correct. THAMPITAHK did not ask him about sales taxes.



d.      B.D. did not tell THAMPITHAK the approximately $1,200 claimed as a personal property taxes paid deduction on Schedule A. He did not pay personal property taxes, and the amount was incorrect.

e.      B.D. did not tell THAMPITHAK the mileage used to compute the about $14,375 claimed as an EBE paid deduction on Form 2106. THAMPITHAK did not ask B.D. how much he drove his personal car. B.D. told THAMPITHAK he drove his car to work. B.D. told THAMPITHAK he usually drove the client's car, but he did sometimes drive his own car. B.D. said he did not know how many miles he drove, and he did not track how many miles he drove his personal car for clients.

f.      B.D. said he had no idea why there was approximately $925 vacation house expense claimed as a miscellaneous expense deduction on his Schedule A. B.D. had no vacation home. He recalled THAMPITHAK asked him if he went on vacation, and he shared with her that he went to the Philippines.

29.     Based on my training, experience, conversations with other law enforcement officers, participation in other investigations, and the foregoing, I know:

a.      THAMPITHAK prepared B.D.'s 2015 Form 1040 in exchange for money. The return was materially false.

b.      B.D. was not entitled to claim the foregoing deductions that totaled approximately $22,498 (after adjusted gross income limitations), which were included in his 2015 Schedule A Line 29. The false deductions resulted in B.D. receiving a refund for overpayment of tax approximately 325 percent more than the amount due him.



*Witness R.T.*

30.     On or about January 29, 2018, R.T. was interviewed and provided the following pertinent information regarding her 2016 Form 1040:

      a.     R.T. did not recall the preparer's name; however, R.T. described the location of THAMPITHAK's residence when asked where her return was prepared. R.T. paid the preparer about $200.

      b.     R.T. did not provide the preparer the approximately $1,121 claimed as a general sales taxes paid deduction on Schedule A. R.T. added she did not pay that amount.

      c.     R.T. did not provide the number of miles used to compute the approximately $13,500 claimed as an EBE deduction on Form 2106. The only number R.T. gave the preparer was 12,000. R.T. told investigators she did not use her car for her employer. R.T. said she did not know this was on her return.

      d.     R.T. did not provide the preparer the approximately $960 gas expenses claimed as a miscellaneous expense deduction on Schedule A.

31.     Based on my training, experience, conversations with other law enforcement officer, participation in other investigations, and the foregoing, I know:

      a.     THAMPITHAK prepared R.T.'s 2016 Form 1040 in exchange for money.

      b.     R.T. was not entitled to the foregoing deductions that totaled approximately $14,526 (after adjusted gross income limitations), which were included in her 2016 Schedule A Line 29. The false deductions resulted in R.T. receiving a refund for overpayment of tax approximately 258 percent more than the amount due her.



*Witness R.S.*

32.    On or about January 22, 2018, R.S. was interviewed and provided the following pertinent information regarding her 2016 Form 1040:

a.    R.S. did not recall the preparer's name; however, R.S.'s spouse identified the preparer as THAMPITHAK. R.S. paid THAMPITHAK about $200.

b.    R.S. did not pay the approximately $1,800 claimed as a state and local income tax expense deduction on Schedule A. R.S. had not worked outside of Alaska (i.e. in a locality with an income tax).

c.    R.S. did not pay the approximately $4,801 claimed as a personal property taxes paid deduction on Schedule A. R.S. shared that she did not own a home, have a mortgage, or possess anything that she would have paid personal property taxes on.

d.    R.S. did not provide the mileage used to compute the approximately $13,643 claimed as an EBE deduction on Form 2106. R.S. told THAMPITHAK she used her personal vehicle to go to and from work (i.e. commute).

33.    Based on my training, experience, conversations with other law enforcement officers, participation in other investigations, and the foregoing, I know:

a.    THAMPITHAK prepared R.S. 2016 Form 1040 in exchange for money. The return was materially false.

b.    R.S. was not entitled to claim the foregoing deductions that totaled approximately $20,248 (after adjusted gross income limitations), which were included in her 2016 Schedule A Line 29. The false deductions resulted in R.S. receiving a refund for overpayment of tax approximately 226 percent more than the amount due her.



*Witness V.L.*

34.     On or about December 17, 2018, V.L. was interviewed and provided the following pertinent information regarding his 2017 Form 1040:

      a.     V.L. said he did not know the preparer's real name. He called her Sun (phonetic), which meant short in Lao. V.L. paid the preparer about $100.

      b.     When asked about the approximately $4,000 residential energy credits carryforward from 2016 claimed on Form 5695, V.L. said he did not talk with the preparer about anything from tax year 2016. V.L. gave the preparer receipts. After investigators explained residential energy credits to V.L., he said he spent about $100 or $200 to fix his heating and about $1,000 on flooring and tools. V.L. shared that he did not have receipts for the heating or the flooring.

35.     Based on my training, experience, conversations with other law enforcement officers, participation in other investigations, and the foregoing, I know:

      a.     THAMPITHAK prepared V.L.'s 2017 Form 1040. The return was materially false.

      b.     V.L. was not entitled to the residential energy credits claimed on his 2017 Form 5696, which carried forward to his 2017 Form 1040 Line 53. This false credit resulted in V.L. receiving a refund for overpayment of tax approximately 562 percent more than the amount due him.

<u>THAMPITHAK Acted Willfully</u>

*Undercover Operation*

36.     On or about March 1, 2018, an IRS-CI undercover agent ("UCA") met with THAMPITHAK to have a Form 1040 prepared. The information provided by the UCA should



have resulted in a Form 1040 with a total tax of $2,980 and owing $87. During the preparation, THAMPITHAK acknowledged the Form 1040 she initially prepared showed $87 was owed. However, THAMPITHAK prepared a Form 1040 that claimed $2,500 residential energy credits on Line 53. THAMPITHAK neither discussed the residential energy credit, nor did she obtain any documentation from the UCA regarding residential energy credits. THAMPITHAK provided a printout of the Form 1040 to the UCA, which showed it was self-prepared and tax was overpaid (i.e. a $2,413 refund was due).

37. Based on my training, experience, conversations with other law enforcement officers, and participation with other investigations, I know the foregoing showed THAMPITHAK willfully prepared a materially false Form 1040 on behalf of the UCA.

*THAMPITHAK Interview*

38. On or about April 3, 2018, THAMPITHAK was interviewed by IRS-CI. She provided the following pertinent information:

     a. A person could spend three months to five years in prison and have to pay a fine for providing false information on a tax return. She added that she knew if she put something false on her tax return she could be fined or put in jail.

     b. She said she understood penalty of perjury meant that if a person put something false, he or she could be fined or put in jail.

     c. She said she knew a person could go to jail for adding false items to a tax return.

     d. She initially claimed to investigators that all information on the tax returns she prepared came from her clients, and she cautioned the clients that they would need

proof for any amount on the tax return. She added that she did not put anything additional on her clients' individual income tax returns without their knowledge.

        e.     When confronted that she was lying to investigators and that investigators had video of her preparing a false return for the UCA, THAMPITHAK admitted for some of her clients she added items to get them larger refunds. When asked how many times she claimed false items on her clients' Forms 1040, THAMPITHAK said "half and half".

        f.     When asked again if she claimed items on her clients' Forms 1040 that were not true, THAMPITHAK nodded yes.

39.     Based on my training, experience, conversations with other law enforcement officers, and participation in other investigations, I know the foregoing showed THAMPITHAK knew she had a legal duty to prepare accurate and true tax returns. She knew she could go to jail and or be fined for preparing false returns. She initially lied to investigators to conceal her criminal conduct, and only admitted to her criminal conduct when confronted with the fact there was a video of her preparing a materially false tax return.

*THAMPITHAK Misrepresented Her Knowledge of Tax Matters to Clients*

40.     According to M.H., she mentioned to THAMPITHAK she was considering going to H&R Block to prepare her tax returns. THAMPITHAK conveyed the following to M.H:

        a.     THAMPITHAK used to work for H&R Block.

        b.     H&R Block was trained by the Government to not give as big of a refund so the Government would not lose as much money giving back refunds.

        c.     H&R Block did not allow its preparers to navigate the areas to get more its customers more of a refund (leaving areas untouched).



      d.      THAMPITHAK was able to spend more time navigating the systems and touching areas to get more of a refund than H&R Block preparers.

      e.      H&R Block supervisors would stand behind their tax preparers and check to see if the tax preparers were doing more than they were supposed to be doing. The supervisors did not want the customers to get more of a refund.

41.      According to P.L., THAMPITHAK told him she worked for H&R Block but was laid off.

42.      According to R.V., THAMPITHAK told him she went to school to be a lawyer, had been preparing tax returns a long time, and had lots of clients.

43.      According to T.B., THAMPITHAK told her she worked for H&R Block.

44.      According to B.D., THAMPITHAK previously worked for H&R Block and Liberty Tax.

45.      When interviewed on April 3, 2018, THAMPITHAK told investigators she had not worked for a tax preparer to include H&R Block. She had no formal training on tax matters. She said it was easy to prepare tax returns using online software by going through and following the questions prompted by the tax return preparation programs.

//

//

//

//

//

//

//



## CONCLUSION

46.     I submit that this affidavit supports probable cause to believe that

THAMPITHAK has committed violations of Title 26 U.S.C. § 7206(2), Fraud and False

Statements.

Digitally signed by Clinton J.
Wight
Date: 2020.07.13 15:20:52
-08'00'

CLINTON J. WIGHT
Special Agent
Internal Revenue Service

Subscribed and sworn to before me
this __14__ day of July, 2020

DEBORAH M. SMITH
Chief United States Magistrate Judge
District of Alaska
Anchorage, Alaska